# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 43
The People &c.,
      Respondent,
   v.
Jaime Lopez-Mendoza,
      Appellant.

Christina A. Swarns, for appellant.
Susan Axelrod, for respondent.

WILSON, J.:

Defendant Jaime Lopez-Mendoza challenges his conviction of first-degree rape on two grounds: (1) he was denied the effective assistance of counsel because his trial attorney failed to review, or failed to comprehend the significance of, surveillance video evidence

contradicting his grand jury testimony of a consensual sexual encounter with the victim, and therefore proceeded at trial as if the grand jury testimony were true; and (2) the introduction of DNA evidence violated his Sixth Amendment rights, because the analyst who testified at trial did not generate the DNA profile taken from his buccal swab. On the present record, defendant has not carried his burden of demonstrating ineffective assistance of counsel and the introduction of the DNA evidence was harmless even if erroneous. We therefore affirm.

I.

A young couple drove to Manhattan on the day after Christmas, 2009. They checked into room 205 of a hotel at 7:14 PM. After a night out with friends in New York City, they returned to their hotel at 2:37 AM on December 27. Intoxicated, they were unable to unlock the door to their room. Mr. Lopez-Mendoza, a hotel employee, appeared and opened the door using one of their card keys. According to the couple, they both passed out on top of the hotel bed almost immediately. According to the victim, she was awakened by a person having sexual contact with her. She thought it was her boyfriend and stopped the encounter. She was again awakened during the act of sexual intercourse. Realizing the person was not her boyfriend, who was still asleep next to her in the bed, she began screaming. She testified seeing a bump under the covers and a figure, low to the ground, scuttling out of the room. Her screams awakened her boyfriend. After the victim dressed, the pair bolted into the hallway. They saw no one. Believing her assailant was next door in room 206, the victim pounded on that door, still screaming. At 3:40 AM, the hotel sent

a security guard to the second floor in response to noise complaints. Several minutes later, the hotel sent Mr. Lopez-Mendoza to assist the guard. When Mr. Lopez-Mendoza appeared, the victim identified him as her attacker, which resulted in a further disturbance. Both the hotel personnel and the victim called 911. The police responded.

When first interviewed by a police officer, Mr. Lopez-Mendoza said that he had assisted the couple to enter their room, and no more. The police officers left, and Mr. Lopez-Mendoza continued his shift at work. The officers returned, and one officer interviewed Mr. Lopez-Mendoza at 6:15 AM, obtained his work uniform (which he had placed in a laundry bin), and asked him to tell the truth. Mr. Lopez-Mendoza told the officer that "he had sex with her but didn't force himself on her." The officers arrested him.

Two days later, Mr. Lopez-Mendoza executed a waiver of immunity pursuant to CPL 190.45 and testified voluntarily before a grand jury, in the presence of his attorney. Mr. Lopez-Mendoza testified in great detail as to the events at the hotel, saying that just after he opened the couple's room door for them, he and the woman, at her insistence, had consensual sex on the bed where her boyfriend lay sleeping. Both the prosecutor and the grand jurors had questions for Mr. Lopez-Mendoza, and he reiterated this version of the events several times, adding details about his use and disposal of a condom.

At some point after his grand jury testimony and before trial, the People delivered to defense counsel a substantial volume of hotel surveillance video. The hotel had surveillance video of the ground floor and lower levels but not of the guestroom floors.

The surveillance video shows that the couple entered the hotel lobby at 2:37 AM. The hotel's computer records show that the room's lock was opened at 2:38 AM. The video also shows that Mr. Lopez-Mendoza exited the basement elevator at 2:40 AM, went to the utility area and left through the employees' entrance, returning through the lobby at 2:42 AM to get an umbrella from the front desk, and then exited the hotel. It then shows him returning to the hotel at 3:09 AM through the employees' entrance, going to the men's locker room, and entering the service elevator at 3:11 AM. At 3:38 AM, the video shows him exiting the service elevator and taking a large garbage bag to the laundry area.

DNA from saliva recovered from the victim's breast matched Mr. Lopez-Mendoza's, but the vulva swabs did not contain his DNA. Defendant was indicted for the crimes of rape in the first degree, criminal sexual act in the first degree, and two counts of sexual abuse in the first degree on the theory that the sexual acts were nonconsensual due to the physical helplessness of the victim.

Approximately a month before trial, the People advised defense counsel that surveillance video evidence demonstrated the falsity of Mr. Lopez-Mendoza's grand jury testimony. The parties agree that the video demonstrates that Mr. Lopez-Mendoza's grand jury testimony is false, because he could not have had sex with the complainant within the three minutes between the couple's entry into the hotel lobby on the way to their room and Mr. Lopez-Mendoza's exiting the elevator in the basement.

In his opening, defense counsel nevertheless hewed to the timeline his client had given to the grand jury, advising the jury that it would "learn from the defendant that [the

victim] appeared to be in an amorous mood . . . starts suggesting to him that he should come into the room . . . and starts taking some clothing off." Mr. Lopez-Mendoza bases his ineffective assistance claim on the premise that his trial counsel's opening statement proves that counsel did not review the video evidence or did not understand its importance.

Mr. Lopez-Mendoza points to a mid-trial colloquy that, he asserts, bears on the question of whether defense counsel had seen the video evidence. The People sought to introduce excerpts of the surveillance video that had been compiled from 26 surveillance cameras stationed around the hotel's ground floor and basement level. Defense counsel objected, and a discussion ensued. When defense counsel said that he "would like to have the Court review the videos first before making any decision about whether they are even admissible and what they show," the Court asked, "Have you seen the video?" Counsel responded: "Yes. I was never given these particular – I mean, I have like a hundred gigabytes of video, and I ask[ed] for the relevant information." The Court then asked, "Did you receive the videotapes or not?" Counsel responded, "It's not a tape it's a hard drive with over a hundred gigabytes." The colloquy continued:

> THE COURT: That's not my question. My question is, did you receive it?
>
> COUNSEL: I didn't see what [the prosecutor is] talking about.
>
> THE COURT: My question is, did you receive it?

COUNSEL: I received a hard drive with a huge amount of material equivalent to maybe a hundred movies. . . . I would like to know in advance which cameras and which time periods [the prosecutor is] talking about.

The People confirmed that the entirety of the surveillance video had been turned over to the defense, so that everything the People intended to play for the jury was within defense counsel's possession. Then, the People stated: "He should have watched the videos, especially in light of the fact that we had a bench conference, and I told him that I saw it, that his grand jury testimony was not accurate, was not truthful because we saw the defendant in these other areas when he was supposedly having sex with the victim." Immediately after that statement, the Court asked defense counsel whether he had received the entirety of the surveillance video, and defense counsel confirmed that he had. The record does not contain confirmation or denial of the People's implied accusation that defense counsel did not watch the video.

The People subsequently introduced into evidence portions of the surveillance video, undermining the version of events Mr. Lopez-Mendoza related in his grand jury testimony, and which defense counsel recited in his opening statement. After the People rested, defense counsel advised the Court that "after continued reflection overnight, confirmed this morning, my client will not testify." The Court then advised Mr. Lopez-Mendoza that the choice to testify was "yours not [counsel's]," and that if he chose not to testify "I will instruct the jury they cannot hold that against you; no adverse inference will be taken." Mr. Lopez-Mendoza told the Court that he did not want to testify.

In summation, defense counsel attacked the complainant's version of events and argued a version of the facts that was inconsistent with what he described in his opening. He attacked the videotape evidence on two grounds: (1) although it showed the defendant entering the basement at 3:11 and 3:38, both times he was in the basement coming from the same direction, and the video never shows him leaving the basement in-between, so Mr. Lopez-Mendoza could not have been the attacker if it occurred within that time frame; and (2) if the attack occurred between 2:37 and 2:40, it could not be anything like the incident the complainant described. It would have had to be a momentary encounter only long enough to allow for finding Mr. Lopez-Mendoza's saliva on her breast. He further argued that a shorter encounter would have been consistent with Mr. Lopez-Mendoza's statement to police that the encounter was consensual, as that statement did not describe the sexual encounter in any detail. He also called an Emergency Medical Technician who attended to the victim at the scene; the EMT testified that the victim had said that the attack occurred "moments" after Mr. Lopez-Mendoza helped her open the door to the hotel room. Defense counsel also called investigators who testified that they had tested the door to room 205 and determined that it closed and locked when released. The jury convicted Mr. Lopez-Mendoza of first-degree rape and acquitted him of the criminal sex act charge.

## II.

"In determining whether counsel provided effective assistance, the core of the inquiry is whether defendant received meaningful representation. In making that assessment, the court must view counsel's performance in its totality" (People v Wragg,

26 NY3d 403, 409 [2015]).  Mr. Lopez-Mendoza argues that his attorney's opening statement undermined his case by promising the defendant would take the stand and making arguments contradicted by video evidence, then failing to call defendant to the stand and closing with a new version of events.  The ineffective assistance, he argues, was caused by either his attorney's failure to review the video evidence or his failure to understand its importance.  Either way, Mr. Lopez-Mendoza contends, that failure proved disastrous.

The defendant "bears the ultimate burden of showing . . . the absence of strategic or other legitimate explanations for counsel's challenged actions" (People v Clark, 28 NY3d 556, 563 [2016] [internal quotation marks omitted]).  The record here is insufficient to make that showing.  Although "[i]t simply cannot be said that a total failure to investigate the facts of a case, or review pertinent records, constitutes a trial strategy resulting in meaningful representation" (People v Oliveras, 21 NY3d 339, 348 [2013]), the limited record in this case does not conclusively establish that counsel was ineffective.  On its own, the decision not to call a witness after promising to do so does not establish ineffective assistance of counsel as a matter of law (People v Benevento, 91 NY2d 708, 714–715 [1998]).

Further, on this record, defendant has failed to demonstrate that he otherwise was denied meaningful representation.  The video evidence demonstrated the falsity of defendant's grand jury testimony.  We do know that the jury never learned of Mr. Lopez-Mendoza's grand jury testimony and that he was never subjected to cross examination with

it.  Instead, counsel elicited testimony from the EMT that the victim stated the assault occurred "moments" after the victim entered her hotel room, which was inconsistent with the People's theory that the assault happened between 3:11 and 3:38.  But on the present record, we cannot determine whether the above was part of a strategy employed by counsel, because the present record does not address defense counsel's strategic trial decisions, if any.  The colloquy concerning defense counsel's viewing of the surveillance video is inconclusive: counsel answered the Court that he had "seen" the video, though it is certainly possible that he had not seen it, had not seen the right portions of it, or misunderstood its import despite a warning from the People a month earlier.  The colloquy was not directed at whether defense counsel had reviewed the video, but rather whether he was entitled to review the People's compilation of excerpts from the video before they were introduced into evidence.  Because the question of whether counsel viewed the entirety of the surveillance footage was never addressed head on, the record does not indicate whether defense counsel reviewed the video before determining a trial strategy.  Accordingly, we cannot determine whether, before trial, counsel reviewed and understood the import of the video evidence.  Moreover, it is also possible – and undeterminable on this record – that defendant, having heard the trial evidence, himself decided not to testify.

"[T]he lack of an adequate record bars review on direct appeal . . . wherever the record falls short of establishing conclusively the merit of the defendant's claim" (People v McLean, 15 NY3d 117, 121 [2010]).  Here, it is "essential[] that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or

post-conviction proceeding brought under CPL 440.10" (People v Brown, 45 NY2d 852, 853-854 [1978]).  Such a proceeding could answer the questions left open on this record, including whether counsel reviewed the video evidence at all, or whether he may have misunderstood that the evidence was flatly inconsistent with his opening argument.

### III.

Defendant also argues the introduction of DNA evidence at trial violated the Sixth Amendment (see People v John, 27 NY3d 294 [2016]).  Here, the issue was whether the victim consented to sexual contact with defendant; identification was not at issue. Because the DNA evidence did not go to the determinative issue of consent, any error in admitting it was harmless.

The order of the Appellate Division should be affirmed.

People v Jaime Lopez-Mendoza

No. 43

RIVERA, J. (dissenting):

Defendant Jaime Lopez-Mendoza claims that he was denied effective assistance of counsel because his trial attorney pursued a defense after the People forewarned him it was clearly disproven by surveillance video provided to counsel in discovery. The record

- 1 -

establishes that counsel pursued a theory explicitly contradicted by video evidence and there can be no strategic reason for adoption of a course of action with no hope of success. Therefore, I would reverse defendant's conviction and grant him a new trial. The majority fails to render a decision on counsel's effectiveness, concluding only that the trial record is inadequate to decide the issue and that the merits can be explored in a CPL 440.10 post-conviction proceeding. However, even accepting the majority's view of what counsel may have intended, there is no way to rationalize counsel's choice.

Every defendant has a constitutional right to the effective assistance of trial counsel (Strickland v Washington, 466 US 668 [1984]; People v Benevento, 91 NY2d 708, 712 [1998]; People v Baldi, 54 NY2d 137 [1981]). This includes counsel's exercise of informed professional judgment in choosing the proper course of the defense (People v Colville, 20 NY3d 20, 32 [2012]). With few fundamental exceptions for decisions that belong solely to a defendant, counsel is responsible for determining how best to represent the client (see People v Hogan, 26 NY3d 779, 786 [2016] [collecting cases]; People v Colon, 90 NY2d 824, 825-826 [1997] [decisions belonging to a defendant are those "such as 'whether to plead guilty, waive a jury trial, testifying in [their] own behalf or take an appeal'"], quoting People v White, 73 NY2d 468, 478 [1989]). "If defense counsel solely defers to a defendant, without exercising [counsel's] professional judgment, on a decision that is 'for the attorney, not the accused, to make' because it is not fundamental, the defendant is deprived of 'the expert judgment of counsel to which the Sixth Amendment entitles [the defendant]'" (Hogan, 26 NY3d at 786, quoting Colville, 20 NY3d at 32).

To establish a claim of ineffectiveness, a defendant "must demonstrate the absence of strategic or other legitimate explanations for counsel's alleged failure" (People v Wragg, 26 NY3d 403, 409 [2015], citing People v Satterfield, 66 NY2d 796, 799-800 [1985]). "The core of the inquiry is whether defendant received 'meaningful representation'" (Benevento, 91 NY2d at 712; see also Baldi, 54 NY2d at 147). "As long as the defense reflects a reasonable and legitimate strategy under the circumstances and evidence presented, even if unsuccessful, it will not fall to the level of ineffective assistance" (Benevento, 91 NY2d at 712-713, citing People v Lane, 60 NY2d 748, 750 [1983]). "The test is reasonable competence, not perfect representation. However, that test cannot be so weak as to deny a defendant adequate due process" (People v Oathout, 21 NY3d 127, 128-129 [2013] [internal citations and quotation omitted]). "Essential to any representation, and to the attorney's consideration of the best course of action on behalf of the client, is the attorney's investigation of the law, the facts, and the issues that are relevant to the case" (People v Oliveras, 21 NY3d 339, 346 [2013]; see also People v Droz, 39 NY2d 457, 462 [1976] ["(I)t is elementary that the right to effective representation includes the right to assistance by an attorney who has taken the time to review and prepare both the law and the facts relevant to the defense"]). Based on this investigation, counsel must "determine if matters of defense can be developed, and [] allow [] time for [counsel's] reflection and preparation for trial" (People v Bennett, 29 NY2d 462, 466 [1972]). Inherent to the nature of legal representation and counsel's obligations to the client, is the requirement that counsel both obtain relevant materials and review and consider their application to the

unique facts of a defendant's case, applying counsel's expertise to the task. While counsel may decide amongst alternatives, counsel may not fail to adequately investigate and then adopt "a 'strategy' 'born in the blind'—one [that counsel] admittedly pursued without benefit of" matters revealed in the course of counsel's investigation (Oliveras, 21 NY3d at 347).

An ineffective assistance of counsel claim may be raised for the first time on direct appeal (People v Jones, 55 NY2d 771, 773 [1981]). In such a case, the inquiry is simply whether there is a sufficient record to support the claim (id.; see People v Brown, 45 NY2d 852, 853 [1978]).

Here, the prosecutor argued in her opening statement that the evidence would show that the door to the victim's hotel room did not fully lock after defendant helped the victim and her boyfriend inside, permitting defendant to later reenter the room and sexually assault the victim while she was unconscious. The prosecutor also told the jury that the evidence would show the time frame for the attack, that the victim identified defendant as her attacker immediately after the assault and that, while defendant confessed to having consensual sex with the victim after he opened the door for her and her boyfriend, his claim was disproved by the evidence.

In his opening statement, defense counsel summarized "what [he] expected the evidence to show and where it may come from." He argued that the evidence would establish that the victim, drunk and under the influence of drugs, falsely accused the defendant because she was embarrassed by their sexual encounter and was "panicking over

things like pregnancy, sexual disease, her boyfriend figuring out she did something." Counsel maintained that the evidence would show "much of her story makes no sense. It's unbelievable." Counsel proposed a different version of the events from that presented by the prosecutor, informing the jurors that they "will learn from the defendant" that the victim was "in an amorous mood" when defendant opened the door and that she initiated the sexual encounter. He told the jury that defendant "goes in with her, and he has sexual activity with her. He used a condom, and when it was over he left the room." Counsel told the jurors "we'll give you evidence" to rebut the People's theory that defendant reentered the room and to establish that "the defendant [was] in a different part of the hotel" during the time when the victim claimed she was assaulted.

At trial, the prosecutor sought to play excerpts from the hotel surveillance video. During a bench conference, the prosecutor explained that the video would refute defense counsel's opening statement because it would show the jury that defendant was in a different part of the hotel at the time when counsel told the jury the victim had invited defendant into her room. The prosecutor informed the court that she had told defense counsel a month earlier that the video established defendant's story was not true. Defense counsel did not dispute that the prosecutor had told him about the import of the video, instead responding that it was his "understanding that there [were] no surveillance videos on the guest floors" which is what he "ha[d] been told. . ." The court asked defense counsel directly if he had seen the video. Counsel responded yes, that he was given "like a hundred gigabytes of video" but that he "wasn't given the camera numbers for the time periods for"

the video the prosecutor wanted to play and he "would like to review those." The prosecutor responded, that defense counsel had requested "the camera angles and specific time period when the victim and her boyfriend appeared because [counsel] didn't know what they looked like, and that . . .was a reasonable request, so I gave him those particular time slots. However, I don't have to tell him what his client looks like."

The court asked defense counsel directly: "Okay. Did you receive videotapes or not?" Counsel responded that it was not a tape but a hard drive with over a hundred gigabytes. The court reiterated, "That's not my question. My question is, did you receive it?" Counsel responded, "I didn't see what [the prosecutor is] talking about." After again being asked directly by the court if he had received all the surveillance video, counsel confirmed that he had, but he wanted to know "in advance which cameras and time periods [the prosecutor is] talking about." The prosecutor twice confirmed that she had provided the entire video surveillance to defense counsel. She had taken the relevant portions of the video that she would be seeking to introduce from the master video she gave to defense counsel and put it on a separate DVD to play for the jury. When the court asked defense counsel why he was objecting to the prosecutor's request for defendant to stand during the playing of the video, counsel stated, "I would like to be provided, first, with the information which cameras and timeframes, all these excerpts are from, and I would like to review them before we make a final decision on that." The prosecutor responded, "I had to watch hours of these surveillance videos just to look for the defendant. . . I don't have to do this work for [defense counsel]. I don't know why he didn't." The prosecutor continued, "He should

have watched the videos, especially in light of the fact that we had a bench conference, and I told him that I saw it, that [defendant's] grand jury testimony was not accurate, was not truthful because we saw the defendant in these other areas when he was supposedly having sex with the victim." Defense counsel said nothing to refute the prosecutor's repeated claims to the court that she had previously informed counsel of the video's significance at a bench conference. Nor did he respond to the prosecutor's allegation that he did not watch the videos after that conversation.

The court granted the People's request to have defendant stand while the video was played. The video showed defendant getting off an elevator in the basement of the hotel at 2:40 a.m.—less than three minutes after the electronic key record established that defendant helped the victim and her boyfriend into their hotel room. The video showed defendant leaving the hotel at 2:42 a.m. and returning at 3:09 a.m. He went into the area by the service elevator in the hotel's basement at 3:11 a.m., then was off camera until 3:38 a.m., when he again appeared on the basement's camera. After the prosecutor's case-in-chief and after calling his defense witnesses, counsel informed the court that defendant was not going to testify.

In his closing statement, counsel addressed the fact that defendant did not testify: "Now, in my opening remarks I mentioned to you that if the defendant testified you might learn certain things. Obviously, he hasn't testified. Anything I said about that is not evidence. It is not before you. It is not to be considered. It is not part of your deliberations." As in his opening statement, counsel argued that the victim lied, and her story was

incredible. He suggested that the jury might want to review the surveillance video during its deliberations and contended that the video did not substantiate the prosecutor's timeline of the attack because it did not show how defendant exited the basement and got to the victim's floor. Counsel then argued that defendant said, "something happened voluntarily" and the DNA showed only contact between defendant's mouth and the victim's breast. Counsel returned to the version of events he outlined in his opening statement to argue that the victim "was in an amorous mood," "open[s] the door and starts soliciting [defendant] and bring him in, trying to get him to take off her clothing. And that's the activity in which the defendant had a sexual contact with her breasts in the minute or two timeframe that happened."

The prosecutor's summation countered that this was not a case of consensual sex. She reminded the jury that defendant admitted to the police he had sex with the victim, and that defense counsel's opening statement confirmed the same. She repeated how counsel's opening promoted a story that defendant had been invited by the victim to come inside the hotel room after opening the door, defendant had sex with her, and that he used a condom. The prosecutor played back parts of the surveillance video, showing defendant in the basement "less than two minutes after he helps the couple into the room. It is impossible for him to have had any sexual contact with [the victim] during that period." Emphasizing the point further, she stated, "there is no way for the defendant to . . . wait until [the victim's] boyfriend] passes out for him to then follow [ the victim] into the room, pull down her pants, pull down his pants and have sexual intercourse and be in the basement all in two

minutes. That's physically impossible." In response to counsel's argument that there was no footage showing how defendant went from the basement to the victim's floor at the time the prosecutor argued the attack occurred, the prosecutor reminded the jury that the hotel general manager had testified that there are no surveillance cameras on the elevator or the guests' floors, and pointed out that defendant was off camera between 3:11 a.m. and 3:38 a.m., which fit the timeline of when the victim testified she was attacked.

Every possible reading of this record establishes that counsel pursued a defense that was certain to be proven false by the surveillance video. Indeed, the record establishes that counsel either did not view or did not understand the import of the video. Notably, counsel never disputed the prosecutor's assertions that he failed to view the video. Yet, counsel presented a theory in his opening based on a time frame of events that was affirmatively disproved by the video. After a sidebar discussion highlighting the video's significance, perhaps as a last attempt to salvage a defense, counsel abandoned the consensual sexual intercourse narrative and presented a competing theory in his summation.

No matter the analytic lens through which we view this case, all lead to the same conclusion. If counsel failed to view the surveillance video in its entirety or the portion that showed defendant's version of events was untrue, then counsel was ineffective for failing to properly investigate the case (Oliveras, 21 NY3d at 348). If he viewed the portion of the video showing defendant in the basement—a highly suspect proposition given that he failed to dispute the prosecutor's allegation that he failed to do so—and nevertheless did not appreciate that it disproved the timing of the defense narrative, then counsel was

ineffective. There is no excuse for failing to view or appreciate the significance of the video given that the prosecutor had informed counsel over a month before the trial that the video established defendant was elsewhere at the exact time he claimed he engaged in consensual sex with the victim. If counsel viewed the video, understood that it showed defendant's version of the events was demonstrably false, and proceeded with a narrative that the prosecutor would easily disprove at trial, then counsel was ineffective for pursuing a defense with no chance of success and no strategic value (see Benevento, 91 NY2d at 712).

Even though the record allows for no other view of counsel's actions, the majority suggests that counsel may have had some unidentifiable strategy that resulted in keeping defendant's grand jury testimony from the jury (majority op at 8-9). This ignores the core ineffectiveness of counsel's representation because if counsel pursued a strategy to keep out this testimony so that he could argue the sexual contact was at some time after defendant helped the victim into her room, such "strategy" would not have been reasonable as a constitutional matter (Benevento, 91 NY2d at 712-713).[1]

---

[1] The majority's focus on the fact that defense counsel elicited from the EMT that the victim had stated the assault occurred "moments" after the victim entered the hotel room (majority op at 9), overemphasizes a single notation in the EMT report and ignores that this was an unrealistic interpretation of the victim's statement. As the prosecutor argued in summation, if the victim told the EMT she was raped "moments" after being let into the room, that statement was not inconsistent with the timeline since the victim had immediately fallen asleep and was not clear on how much time had passed before the assault. Nevertheless, counsel could have elicited this testimony to further challenge the victim's credibility without promising the jury that defendant would testify to a version of events counsel knew to be demonstrably false, and then abandon that version in summation. As defendant is entitled to "meaningful" representation, counsel's ability to elicit evidence helpful to the defendant does not excuse counsel's failure to adequately prepare by

Assuming counsel did or said something, or chose silence—all within the proper bounds of advocacy—which kept the testimony out, counsel still undermined the defense. First, if the prosecutor did not introduce the grand jury minutes because she believed defendant would testify, counsel had already recited the exact same false narrative to the jury. Although opening statements are not evidence, the jurors could not simply ignore that they heard from defendant's own lawyer that defendant claimed he had sex with the victim right after helping her inside the hotel room. Actually, counsel provided an opportunity for the prosecutor's final reminder to the jury of this version, which served to undermine counsel and defendant's credibility in the eyes of the jurors. When counsel promised defendant's testimony and failed to deliver by the end of trial, the prosecutor was able to comment on this failure in summation. If counsel had not promised defendant's testimony—by saying instead that the evidence would show that the victim's version was not true—then the prosecutor would not have been permitted to draw the jury's attention to the fact that defendant did not take the stand. Second, it would be of limited value, if not completely in vain, for counsel to intentionally mislead and confuse the jury with competing defense theories, all to keep out a narrative counsel himself presented to the jury. Indeed, it would mean counsel pursued a perilous strategy that risked the jurors' distrust and ire, and irrevocably damaged the chances for an acquittal. The majority's conclusion that a viable strategy may have guided counsel's actions fails to explain

---

watching the surveillance video nor (assuming counsel watched the video) does it explain counsel's presentation to the jury of two irreconcilable defense theories while simultaneously destroying his own credibility with the jury.

counsel's presentation of two separate diametrically opposed defenses. There is no way to harmonize counsel's opening statement that defendant and the victim had consensual sexual intercourse with his closing argument pivoting to an entirely different defense.

In this case, which turned on the People and defendant's competing narratives of the sexual attack, counsel's actions were devastating to the defense. There is no reasonable strategy that renders this representation meaningful (see People v Turner, 5 NY3d 476, 480 [2005] ["(O)ur decisions, and the United States Supreme Court's, have recognized that there may be cases in which a single failing in an otherwise competent performance is so 'egregious and prejudicial' as to deprive a defendant of (a) constitutional right"], quoting People v Caban, 5 NY3d 143, 152 [2005]); see also People v Harris, 26 NY3d 321, 326-327 [2015] [counsel ineffective because defense strategy was not reasonable]). I dissent.[2]

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order affirmed. Opinion by Judge Wilson. Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur. Judge Rivera dissents in an opinion.

Decided June 13, 2019

---

[2] I agree with the majority's conclusion that any error in the introduction of the DNA evidence was harmless (majority op at 10).